# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

## OCTOBER TERM, 1872.

---

### JOHNSTON and others *vs.* JONES and others.

1. A court of equity has no jurisdiction to remove an officer from an office of which he is in possession, or to declare such office forfeited. But when, in a suit of which equity has jurisdiction, the question of the right to an office, or as to the regularity of an election, arises, and must be decided to obtain the equitable relief, that court is competent to inquire into and decide these matters for the purpose of the suit. But its decision will not, like that of a court of law, upon a *quo warranto* or *mandamus*, operate *in rem*, and remove or oust any one from an office which in fact he holds.

2. To enforce trusts, suppress frauds, and compel the performance of contracts, are peculiarly within the province of a court of equity. These ends may be attained by injunction, decree for specific performance, or both. If the subject matter be within the jurisdiction of the court, all its powers and process will be used to effect the object to be attained.

3. That the defendant obtained an office claimed by him in a corporation by an election procured to be held by him by fraud, by breach of trust and a positive agreement, by concealment and treachery, confers on a court of equity jurisdiction to inquire into the validity of such election, for the purpose of restraining the acts of the defendant and other persons claiming office by such election. This could be done, even if the election held in such breach of trust had been conducted in the manner required by law, and would not be set aside by the courts of law.

4. When the object of a bill, filed in the name of a corporation, is to restrain acts of the defendants which they could only legally do as directors, they must show either a legal election that would put them in possession

Johnston v. Jones.

of the offices, or that they are *de facto* directors of the corporation; and these facts must be determined by the court in order to decide whether the answer is sufficient to dissolve the injunction.

5. When a charter directs that all elections of directors after the first shall be held annually, at such time as the by-laws shall direct, no second election can be held until by-laws designating the time have been adopted. Nor can there be an omission to hold an election, such as to authorize the directors to designate a day for it provided for only in case of such omission.

6. Acts required to be done by the directors of a company, as the designating a time for election, must be done by them as a board when lawfully convened.

7. A determination by the board or a majority of directors that an election must be held, without fixing a time, does not authorize one of them to fix the time and give notice for such time.

8. A notice of an election required to be given by the directors, is not a sufficient notice, if signed by the individual names of a majority, without stating that it was given by order of the board, or stating that the persons whose names were signed were directors.

9. An election is not legal, if the list of stockholders exhibited and acted upon on the day of election is not a true list of the stockholders, and known not to be such by the parties who exhibit it, and who vote upon it.

10. Stockholders who are not such at the day an election is held, cannot vote, although they were stockholders at the day on which it should have been held.

11. A majority of a board of directors, who have been legally elected, and are in fact in possession of their offices, and in whose place no directors have been legally elected, have the right to use the name of the corporation in a suit.

The argument was on motion to dissolve the injunction in this suit, made on bill and answer.

*Mr. I. W. Scudder* and *Mr. J. B. Vredenburgh*, for motion.

*Mr. Vanatta* and *Mr. Frelinghuysen*, contra.

THE CHANCELLOR.

The injunction was granted on application of the complainants, Johnston and the Perth Amboy and Elizabethport Railroad Company, to restrain the defendants, Jones, Carpenter, Arnold, Bell, and Lindsley, who claimed to have been elected directors of the company, from interfering with the contract-

ors in constructing the road of the company, and from selling or pledging any stock of the company, and from exercising the rights and powers of directors.

The charter of the company, by the act approved March 30th, 1869, fixed the capital at $200,000, in shares of $100, with the privilege of increasing it to $300,000, with power to go into operation when $20,000 was subscribed for, and ten per cent. paid in upon it. In August, 1869, $20,000 of the capital - was subscribed for by B. Williamson, A. Green, C. Parker, A. W. Jones, D. P. Carpenter, and eight other persons, who subscribed for five shares each. The ten per cent. on the whole was paid by the check of B. Williamson, for $2000, payable to the order of A. Green, treasurer ; this was accepted by the commissioners as cash, and was handed by them to the treasurer when elected, and received by him as cash. No part of this money was contributed by any subscriber but Williamson. On the 7th of September, 1869, the five subscribers above named were elected directors. The directors elected Jones, president ; Green, treasurer ; and William Paterson, secretary.

A route or routes for the road was surveyed, but the road was not located, or anything done towards its construction or commencement.

In the spring of 1871 negotiations were had with the complainant, Johnston, to furnish means to construct the road, and a written agreement was entered into by four of the five directors with Johnston, by sending to him the following proposition, which he accepted :

" NEW YORK, June 5th, 1871.
" JOHN T. JOHNSTON, Esq.

" Dear Sir :—The subscribers, directors of the Elizabethport and Perth Amboy Railroad Company, in consideration of the payment by you of $6000 to defray the expenses of organization and other incidental matters, and of your engagement with us to supply the means for the construction of the road without further delay, do hereby place in your hands the

control of its charter, and agree to hold and manage the same in accordance with your wishes, or to vacate our places in favor of such persons as you may designate. Our only condition is, the immediate prosecution of the work.

" The $6000 above mentioned has been used as follows :

| | |
|---|---|
| " To pay Col. A. W. Jones, | $2000 |
| " To pay A. Green, | 2000 |
| "To pay William Bell, former contractor, assignee of E. Handford & Co., | 2000 |
| | $6000 |

" We know of no other possible claims against the company.

" Very respectfully yours,

" C. PARKER,
" A. GREEN,
" B. WILLIAMSON,
" A. W. JONES."

Johnston accepted this proposition, and paid the $6000.

By transfers signed on the transfer book of the company, and dated September 1st, 1871, Green transferred to Johnston all his stock, and each of the other four directors, including Carpenter, who had not signed the proposition, transferred to Johnston all his stock except five shares, and gave to him a power of attorney to transfer these five shares to himself.

Certificates for the shares so transferred, dated on the same day, were signed by Jones, as president, and Carpenter, as secretary, on the certificate book of the company, and issued to Johnston.

The bill alleges that Jones promised Johnston to procure from the eight subscribers for five shares each, powers to transfer these shares to Johnston, and that he procured them to sign blank powers on the representation that they were for Johnston. These facts, supported by the affidavits of six of these subscribers annexed to the bill, are denied in the answer.

At a meeting of the directors, held in New York on September 11th, 1871, Jones, Williamson, Carpenter, and Parker

were present. The resignation of Green, as director and treasurer, was presented and accepted, and Johnston was elected to both offices in his place. Paterson resigned as secretary, and I. W. Watson was elected in his place, and James Moore was elected as engineer. From that time, these persons entered upon and performed the duties of their respective offices, and were recognized as such by the other officers of the company, including Jones and Carpenter. For, although Jones in his answer denies such recognition in general terms, he admits that he applied to Johnston, the treasurer, for salary; and to Watson, the secretary, for the book of minutes.

Johnston paid into the treasury, at different times, $118,000, of which about $112,000 has been expended in prosecution of the work. The route of the road was located, and the location filed in the office of the secretary of state; and in January, 1872, a contract was made with P. Brady for grading the road, and he immediately began his work, and was engaged in it until interrupted by the defendants. Jones, by an understanding with Johnston, was continued as president, with a yearly salary of $2000.

The charter provided that five stockholders should be elected directors, who should continue such for one year, and until others were elected in their stead. That they should manage all the affairs of the company, and should have power to fill all vacancies that should occur in their number. That elections of directors should be held—the first, at a time and place designated and advertised by the commissioners, and upon like notice, annually thereafter, at such time as the by-laws of the company should direct; and if no election should be held upon the day provided by the by-laws, then on any day afterwards designated for that purpose by the directors, upon like notice as aforesaid.

The above facts are alleged in the bill, and substantially admitted in the answer. It avers, indeed, that each of the subscribers did actually pay in money ten per cent. of his subscription—an averment difficult to reconcile with the formal and circumstantial admission that Williamson gave to

Jones his checks for $2000, payable to the order of A. Green, treasurer, and that Jones paid these to Carpenter as chairman of the commissioners, who paid these very checks over to Green as treasurer, for the ten per cent. There may be some way to reconcile these statements, so as to avoid the charge of perjury, but none that can command belief for the averment that each subscriber paid this ten per cent. in money, especially when contradicted by the oaths of seven of these subscribers.

The denial of the answer, that the transfer book and stock certificate book are the books of the company, because never formally adopted by the company, is overcome by the admission that the president and secretary, two of the defendants, and every director treated and used them as the books of the company; these facts make them the books of the company. The same remark applies to the minute book. And the defendants, who held them out to Johnston as the books of the company, and induced them to act upon that representation, would be forever estopped from denying that they are such books.

In this situation of affairs, Jones, in February, conceived the idea of having an election of directors, without the knowledge of Johnston, and by it transferring the control of the company to other parties; and, to carry out the plan, caused a notice to be inserted in some of the newspapers of the counties of Union and Middlesex, of the following purport:

" The stockholders of the Perth Amboy and Elizabethport Railroad are hereby notified to meet at Taylor's Hotel, Jersey City, on Thursday, March 7th, 1872, between the hours of nine and five o'clock, *to wit*, at ten o'clock A. M. of that day, to elect a board of five directors for said railroad company.

" February 14th, 1872.

" A. W. JONES,
" D. P. CARPENTER,
" C. PARKER."

This notice was not actually signed by Jones, Carpenter, or Parker, but their names were signed by Jones' direction, by

his clerk. The answer of Jones and Carpenter states that Parker's name was signed by his authority given to Jones verbally, in general terms; that Jones and Carpenter consulted with Parker, and it was determined by the three to issue a notice for the election, and Jones, as president, was directed so to do; and thereupon Jones designated the time and place for the election.

Jones, although between the date of the notice and the day fixed for the election, called at the office of Johnston, which was also the office of the secretary, and borrowed and returned the book of minutes, and called on Johnston for part of his salary, on pretence that he was going away, yet did not inform Johnston of the intended election; nor was Johnston, who was, *de facto*, treasurer, or Watson, who was, *de facto*, secretary, and who, together, had possession of the transfer and other books of the corporation, requested to make out a list of stockholders for the election. From these admitted facts the inference is irresistible that it was intended to conceal the intended election from Johnston.

On the 7th of March, 1872, the time fixed in the notice, Jones and Carpenter, two of the stockholders, appeared. No other stockholders attended. They chose inspectors of election, and they produced a list of stockholders, with the number of shares held by each, dated February 23d, 1872, signed by Jones as president, and one B. F. Arnold as clerk. This list was not made out by the secretary or treasurer, or person having charge of the transfer book, nor from the transfer book; nor was it a true list of all the stockholders entitled to vote at such election, and of the shares held by each from the transfer book, which, by the statute to prevent fraudulent elections, (*Nix. Dig.* 170, § 13,) is the only evidence of who are stockholders entitled to vote. The answer admits that Jones, Carpenter, Parker, and Williamson had each transferred all his stock except five shares, and that Green had transferred all his stock, to Johnston on the book treated by all the directors as the transfer book, and that Jones and Carpenter had signed the certificates of these transfers, though

without the seal of the company. Yet Johnston, who then held these one hundred and forty shares out of the two hundred, did not appear on that list as a stockholder; and the parties who had actually transferred these shares, appeared on this list as stockholders. These transfers were known to Jones and Carpenter, who produced and exhibited and voted upon this list, which they knew was not a true, full, and complete list of the stockholders entitled to vote at that election. The votes of some others of these stockholders who had not transferred their shares, were given by Jones by proxies which he held from them. He voted on ninety shares, including the eighty-five which he had transferred to Johnston, and Carpenter voted on the fifteen which he had transferred. One hundred and forty votes were thus given for the defendants, Jones and Carpenter, B. T. Arnold, W. Bell, and G. R. Lindsley.

These five men thereupon immediately held a meeting, chose Jones, president, and Arnold, secretary, and adopted by-laws, and a transfer book, certificate book, and stock ledger, which had been prepared, and were presented by Jones. At subsequent meetings they appointed a vice-president, a transfer clerk, and treasurer. On the 12th of March, 1872, they opened books of subscription for the capital stock. Jones subscribed for fifteen hundred shares, and presented claims against the company for $13,200, which were allowed by these directors, notwithstanding the assurance of Jones to Johnston in the written contract of June 5th, 1871, that he knew of no other possible claim against the company than the $6000 then asked from and paid by him. This sum was accepted as payment of the ten per cent. on one thousand three hundred and twenty of the shares subscribed for by him. Jones thereupon sold, or alleges that he sold, one hundred and eighty-seven of these shares, on which ten per cent. had been thus allowed, to one William J. Howard, for $7456 in cash.

About the 11th of April, 1872, Jones, with a large force of men, drove Brady, the contractor, from one section of the

road on which he had been at work under his contract, and forcibly took possession of this section, or one-tenth of the whole work; and then these men, under his direction, proceeded to grade that section on a plan and at an elevation entirely different from that required in the contract with Brady, and forcibly kept Brady and his men from proceeding with the work there; Brady continuing the work on the other sections.

Johnston, about the 15th of April, 1872, by virtue of the powers of attorney given to him by Jones and Carpenter, transferred on the books of the company the five shares of the original stock still standing in the name of each of them.

The bill seeks relief on the ground that Johnston having, on faith of the agreement of June 5th, 1871, paid all the prior expenditures of the road, and advanced more than $100,000 since for its construction, and having allowed Jones and Carpenter, each, to retain five shares of stock, which, in fact, belonged to him, to enable them to hold their positions as directors for his benefit, they were trustees for him, and that they have been guilty of fraud and treachery in the attempt to take the control of the road from his hands by an election got up without regard to the requirements of law, and concealed from him by artifice and duplicity; and that the whole conduct of Jones and Carpenter in this matter, has been in violation of the written agreement of June 5th, 1871, which was signed by Jones and acquiesced in by Carpenter by his transfer of stock in accordance with it.

Although Jones, in his answer, says that he does not recollect signing this agreement, yet on the argument, upon being shown the original by his counsel in open court, he admitted the signature to be his. By that agreement the control of the charter was placed in Johnston's hands, and the directors agreed to manage it in accordance with his wishes or to resign. It was not an agreement to give the control at some future day; its words are, "we do hereby place."

That Jones or Carpenter never paid any money for, or had any actual interest in, the stock subscribed for in their names,

is clear.   That they held the five shares retained by each in trust for Johnston, who had powers to transfer them, is equally clear.

The facts of the case, as admitted by the answer, either positively or by implication, show clearly that their conduct toward Johnston in this matter has been full of fraud, treachery, and duplicity, and has been in direct violation of the written agreement.   And for this no excuse or justification is offered, except a general charge of bad faith in endeavoring to obtain sole control of the company ; the very thing they had given him directly by the written contract.   In that contract it was stated that the only condition required was the immediate prosecution of the work.   That he performed this is not denied.

To enforce trusts, suppress fraud, and compel the performance of contracts, are peculiarly the province of a court of equity.   These ends may be attained by means of injunction, or decree for specific performance, or both.   If the subject matter is within the jurisdiction of the court, its powers and process will be used so as to effect the object to be attained. Where a railway company, having acquired lands, is engaged in constructing a road upon them, it is an irreparable injury to be driven from them by trespassers, and to have the work suspended until a trial of a suit in ejectment or of trespass. An injunction is, in such case, a proper remedy.

One objection strongly urged by the defendants is, to the jurisdiction of the court, which, it is contended, has no power to inquire into or determine the legality of an election of the directors of a corporation.   They contend that this is exclusively within the jurisdiction of the courts of law by the appropriate remedies of *quo warranto* or *mandamus*, or by the proceeding authorized by statute.

It is clear that a court of equity has no jurisdiction to remove an officer of a corporation from an office of which he has possession, or to declare the forfeiture of such office.   Its decree will not, like the judgment of a court of law, operate *in rem*, and remove or oust any one from an office which he

in fact holds. When the object is simply to determine the regularity of an election, or to declare an office to which any one has been duly elected, forfeited, a court of law is the proper and only competent tribunal. So it is the only proper tribunal to recover the possession of lands, or authoritatively to settle and declare the title in real or possessory actions. Yet when the object is to protect lands from waste or destruction, to compel the specific performance of a contract, or to exercise any other power over them vested in a court of equity, it may inquire and determine as to the title. Here, the allegations that Jones and Carpenter obtained the positions they claim by breach of trust, fraud, and breach of agreement, gives this court jurisdiction of the matter for the purpose of restraining the breach of trust, and any acts of such breach that may work irreparable injury, and for the purpose of compelling them specifically to perform their contract. This could be done, even if the election held in such breach of trust had been conducted according to law, and would not be set aside by courts of law.

If the question of the legality of an election, or whether a certain person holds such an office, arises incidentally in the course of a suit of which equity has jurisdiction, that court will inquire into and decide it, as it would any other question of law or fact that arises in the cause. But the decision is only for the purpose of the suit; it does not settle the right to the office or vacate it, if the party is in actual possession. In *Doremus* v. *The Dutch Reformed Church*, 2 *Green's Ch.* 332, relied on by defendant's counsel, Chancellor Vroom considered and determined which were the trustees of the church; and his decision of the cause depended on that determination. The question was the validity of a mortgage given by the acting trustees. He held that a court of equity could not determine a question of forfeiture directly, and that it ought not collaterally, except in cases of necessity. He held that the consistory, who mortgaged the property, were then the trustees of the church. He was led to this conclusion by showing that they were legally elected, and continued

to act as such without being removed. In the case of *Den* v. *Bolton*, 7 *Halst*. 206, where, in an action of ejectment, the question incidentally arose with regard to the same corporation, Chief Justice Ewing, in an elaborate and well-considered opinion on the validity of a corporate election, held that the old consistory had been deposed and the new consistory were the true corporation. And an action of ejectment is not the proper means to determine the right to office, any more than a suit in equity. Yet when the question arises the court must meet it and decide.

In this case, Johnston, Parker, and Williamson, with Jones and Carpenter, were, until March 7th, 1872, *de facto* directors of this company, had control of the charter and corporation, had the books and minutes, had control of the property, and were constructing the road. The defendants contend that on that day an election was held that displaced them, and put the corporation in their control and made them directors. To sustain this defence they must show either a legal election that ought to put them in possession of the offices, or that they are *de facto* the directors and the corporation.

This court, to determine the sufficiency of this answer to dissolve this injunction, must determine these questions. A mere answer that they were the directors, without setting out the facts that made them such, would not be sufficient. When these facts are set out, if they do not, in law, constitute them directors either *de jure* or *de facto*, the equity of the bill is not answered.

The objections to the legality of this election are several:

*First.* It was not held at a time authorized by the charter. After the first election all others must be held annually, at such time as the by-laws of the company shall direct. The company had no by-laws, and until they directed the time, no election could be had. And the provision that the directors may designate a time, can only be operative where by-laws have fixed a time and no election is held on that day; the words of the act are clear.

*Secondly.* The day on which it was held was not designated

by "the directors." The directors are a board, and can only act when legally convened. For this, all must have notice or be present. Two at least of the five were not present and had no notice. And even if a majority of the directors, individually, could designate the time, Parker did not join in designating it. According to the answer, he consented to a meeting, and in general words, by parol, authorized his name to be signed to a call, but Jones designated the day.

*Thirdly.* The notice did not purport to be given by the directors or their authority. It was a notice by three individuals, without any designation affixed to their names. No stockholder need regard it. Something should have been added to show that it was by proper authority.

*Fourthly.* No *true* list of the stockholders entitled to vote, and of the shares held by each, was exhibited at the meeting. The list was false in every respect, and known to be so by the parties that exhibited it. The ninth section of the general act does not permit stockholders, who were such at the day when the election should have been held, to vote, if their stock had been transferred since. It only limits the right to such as were then stockholders. Besides, this election is not within that section, which only applies to elections held within thirty days after the prescribed time.

*Fifthly.* Three of the persons elected were not stockholders. Jones pretends to have transferred one share of stock to each. But this could only be legally done on the transfer book of the company, which was in the hands of the treasurer, and no such transfer was made.

An election thus conceived in fraud and conducted contrary to law, cannot create directors *de jure.* There is nothing to constitute them officers *de facto.* Their meeting together, electing officers, procuring new books, and voting that they were the books of the company, cannot constitute them such. Johnston, Williamson, and Parker, in fact, remain in their offices, and, as a majority, constitute the board of directors, and have the right to use the name of the corporation in this suit. They have possession of the books, of the funds, and of the

works of the corporate property, and are clearly the corporation *de facto*.

If a dissatisfied director of one of our large railroad corporations could persuade a town meeting to elect new directors of his company, or was to assemble on such day as he chose to name two of its stockholders, and persuade them to vote on the whole stock of the company instead of twenty shares held by them, for himself and his associates on the ticket named by him, and they were to meet, elect officers, produce and adopt books, and attempt to seize, by force, the road and its equipments, and run the road by their own employees, they would be as much officers *de facto* and *de jure* as these defendants. No one would contend that a court of equity could not restrain, by injunction, such raids as these, but is obliged to leave the corporation and its lawful directors to the remedy at law, always taking at least months, and in the meantime suffer the road to be operated and perhaps ruined by the depredators, because they claim to be directors *de facto* or *de jure*. A court of equity that could hesitate in such case would be of little use.

The motion to dissolve must be refused.